485 So.2d 1008 (1986)
Joseph LEONHARD, et al.
v.
NEW ORLEANS EAST ORTHOPEDIC CLINIC, et al.
No. CA-4004.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1986.
Rehearing Denied April 16, 1986.
Writ Denied June 13, 1986.
*1009 Charles A. Boggs, Chester A. Fleming, III, Boggs, Loehn & Rodrigue, and Winifred M. Delery, New Orleans, for defendants-appellees New Orleans East Orthopedic Clinic, Kenneth L. Veca, M.D., St. Paul Fire & Marine Ins. Co. and La. Patients' Compensation Fund.
Bernard E. Burk, and Jacob Taranto, III, New Orleans, for plaintiffs-appellants, Joseph Leonhard and Rose Leonhard.
Before BARRY, WARD and ARMSTRONG, JJ.
WARD, Judge.
Rose Leonhard and her husband Joseph Leonhard sued Mrs. Leonhard's doctor, Kenneth L. Veca, and others for damages resulting from nerve root injury which developed after Dr. Veca performed a vertebral needle biopsy on Mrs. Leonhard. The basis of the Leonhards' claim was that the written consent signed by Mrs. Leonhard was not valid.[1] The Trial Judge dismissed *1010 the Leonhards' suit because he found that valid consent was given and furthermore that a reasonable person in Mrs. Leonhard's position would have accepted the biopsy even if the risk of nerve root damage had been disclosed.
The record shows that in May 1980, Mrs. Leonhard, then 49 years old, complained to her internist, Dr. Frank Incaprera, of a nagging low back pain which had intensified over the past several months. Because tests indicated the possibility of a malignancy at the fifth lumbar vertebra (L-5), Dr. Incaprera recommended a diagnostic biopsy of the L-5 area.
On Friday, June 13, 1980, Mrs. Leonhard consulted Dr. Veca, an orthopedist, for the biopsy. After examining Mrs. Leonhard and viewing X-rays and test results, Dr. Veca agreed with Dr. Incaprera that a needle biopsy of the L-5 region was medically indicated to exclude the possibility of a malignancy. Dr. Veca explained the purpose of the biopsy to Mrs. Leonhard and immediately hospitalized her.
Around noon on Sunday, a hospital nurse came to Mrs. Leonhard's room and presented the standard consent form to her. The consent form was completely filled in, except for the signatures, and read:
State law requires us to obtain your consent to your contemplated surgery or other medical procedure. What you are being asked to sign is simply a confirmation that we have discussed your contemplated operation or medical procedure. We have already discussed with you the common problems or undesired results that sometimes occur. Please read the form carefully. Ask about anything that you do not understand. We will be pleased to explain it.
1. I hereby authorize and direct DR. KENNETH VECA, with associate or assistants of his choice to perform upon MYSELF, the following surgical, diagnostic, or medical procedure VERTEBRAL BIOPSY L-5 (NEEDLE BIOPSY) including any necessary or advisable anesthesia.
I hereby consent to the administration of such anesthetics as are necessary. The choice of anesthetic to be used shall be made by Dr. LEA AND ASSOCIATES.
I further authorize the doctors to perform any other procedure that in their judgment is advisable for my well being. This operation has been explained to me. Alternate methods of treatment, if any, have also been explained to me, as have the advantages and disadvantages of each. I am advised that though good results are expected, the possibility and nature of complications cannot be accurately anticipated and that, therefore, there can be no guarantee as expressed or implied either as to the result of surgery or as to cure.
2. In general terms, the nature and purpose of this operation or medical procedure is: MAKE SMALL INCISION ON BACK. INSERT A NEEDLE BIOPSY INSTRUMENT TO OBTAIN PORTION OF BONE OF THE FIFTH LUMBER VERTEBRA FOR ANALYSIS.
3. Some risks known to be associated with this procedure including anesthesia, are:
DEATH
BRAIN DAMAGE
QUADRIPLEGIA (Paralysis of all arms and legs)
PARAPLEGIA (Paralysis of both legs)
LOSS OF ORGAN
LOSS OF ARM OR LEG *1011 LOSS OF FUNCTION OF ORGAN
LOSS OF FUNCTION OF AN ARM OR LEG
DISFIGURING SCARS
* * * * * *
I hereby state that I have read and understand this consent, all questions about the procedure or procedures have been answered in a satisfactory manner, and that all blanks were filled in prior to my signature.
I UNDERSTAND THAT THIS CONSENT IS VALID UNTIL REVOKED IN WRITING MY ME.
At the end of the form, Dr. Veca signed a statement which read:
I CERTIFY THAT ALL BLANKS IN THIS FORM WERE FILLED IN PRIOR TO SIGNATURE AND I EXPLAINED THEM TO THE PATIENT OR HIS REPRESENTATIVE BEFORE REQUESTING THE PATIENT OR HIS REPRESENTATIVE TO SIGN IT.
Mrs. Leonhard testified that she signed the form without reading it. The hospital nurse who presented the form and witnessed its signing testified that she did not recall Mrs. Leonhard's case, but that her invariable practice was to read and explain the form to patients. Both Mrs. Leonhard and her husband, who was with her at the time, denied that the nurse read or explained the consent form.
On Sunday evening Dr. Veca visited Mrs. Leonhard in her hospital room for thirty to forty-five minutes, and for the first time, explained the biopsy procedure to her. Dr. Veca has no specific recollection of his discussion with Mrs. Leonhard, but remembers that she was apprehensive about the surgery. Mrs. Leonhard and her husband, who was present during the doctor's visit, testified in detail about her conversation with the doctor. They stated, and other witnesses corroborated, that Mrs. Leonhard's greatest fear before the biopsy was not of the possible cancer but of the risks involved in a surgery on her backspecifically the risk of an injury to the spinal cord which would render her paralyzed or crippled. Mr. and Mrs. Leonhard testified that this fear was communicated to Dr. Veca and he told the patient that there were no nerves in the area to be biopsied and that nothing could go wrong. This testimony was vigorously disputed by Dr. Veca, who, when testifying, denied that he made such a statement or that he would ever make such a patently false representation.
Mrs. Leonhard underwent the needle biopsy on the following day. No malignancy was found. Immediately upon regaining consciousness from the anesthesia however, Mrs. Leonhard experienced severe pain in her left leg and foot. The pain persisted, and Mrs. Leonhard consulted a neurologist who diagnosed nerve root damage at the L-5 level of the spinal column. Mrs. Leonhard has decreased sensation and diminished reflexes in her left leg with decreased strength in the dorsiflexion of her left foot, a condition known as foot drop. She also continues to suffer chronic pain for which there is no cure other than a surgical procedure which rarely brings permanent relief.
Mrs. Leonhard's treating neurologist and even Dr. Veca believe the nerve root was damaged during the biopsy. No testifying physician, however, was of the opinion that Dr. Veca's performance of the biopsy fell below acceptable standards of orthopedic practice, and medical malpractice is not an issue in this case. From the evidence it appears that the occurrence of foot drop is a rare complication of needle biopsies, a risk not even known by Dr. Veca before he performed the surgery, nor known in 1980 by the majority of physicians who testified at trial.[2]
*1012 In his reasons for judgment the Trial Judge made the following findings of fact:
1) Mrs. Leonhard feared the biopsy could cause nerve damage, and she specifically asked Dr. Veca about the risk of that complication;
2) Dr. Veca did not inform Mrs. Leonhard of the risk of nerve damage;
3) Dr. Veca did not know of the risk slight as it wasof nerve damage. Hence, Dr. Veca conveyed to Mrs. Leonhard all the information he knew regarding the risk.
4) The undisclosed complication occurred, causing damage. The Trial Judge then found that Mrs. Leonhard gave valid consent to the needle biopsy and that a reasonable person in her position would have consented to the operation if the risk of nerve root damage had been disclosed.
Mrs. Leonhard makes three arguments in appealing the judgment which dismissed her suit. She first contends that her consent to the biopsy was invalid because it was induced by Dr. Veca's misrepresentations. The issue, Mrs. Leonhard asserts, is not lack of informed consent but lack of consent, to which it is no defense that the reasonable patient, informed of the risks, would have consented. Mrs. Leonhard bases her first argument on the final sentence of Section A of the Uniform Consent Law: "Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts." We reject this argument because we find no misrepresentations of material facts which would vitiate consent.
Mrs. Leonhard claims Dr. Veca misrepresented the medical situation by failing to disclose that there was a risk of spinal nerve damage which could result in loss of use of a limb and by assuring her that there are no nerves in the L-5 area and that nothing could go wrong during the biopsy. Additionally, she claims that Dr. Veca misrepresented the medical situation when he failed to inform her that if there was a malignancy in the L-5 region, it would be incurable.
We agree with the Trial Judge's finding that prior to Mrs. Leonhard's surgery Dr. Veca was not aware of the risk that a needle biopsy could cause nerve root damage as occurred in this case. Therefore, his failure to inform of that risk cannot be characterized as a misrepresentation because one cannot misrepresent something one does not know.
The only alleged statements by Dr. Veca which could be construed as misrepresentations are the assurances which the Leonhards say he made to the effect that "there are no nerves in the L-5 area" and "nothing can go wrong." All physicians who testified at the trial agreed that both of these statements are medically incorrect and that no doctor would make such statements to a patient. Dr. Veca testified that he did not remember what he told Mrs. Leonhard but that he would not make either of the alleged statements to a patient. The Trial Judge, without expressing specific reasons, apparently made a credibility determination in favor of Dr. Veca on this issue. Given the conflicting testimony, we cannot say this determination was manifestly erroneous.
We likewise do not find Mrs. Leonhard's consent vitiated by Dr. Veca's failure to inform her that a malignancy in the L-5 region would likely be incurable. Both Dr. Veca and Dr. Incaprera testified that the biopsy was performed to diagnose Mrs. Leonhard's back problem so that treatment could be instituted, that is, to rule out an incurable malignancy and clear the way for treatment of the back pain. Thus, the purpose of the biopsy was not to diagnose cancer, but to rule out the possibility of cancer. All physicians testified that informing Mrs. Leonhard of the chances for recovery from cancer at that early stage of testing was inappropriate, unadvisable and unnecessary. Given these circumstances, we cannot say that Dr. Veca's failure to inform Mrs. Leonhard of the prognosis for recovery from cancer amounted to a misrepresentation that would vitiate consent to the biopsy.
*1013 Mrs. Leonhard's second argument on appeal is that, even if there were no misrepresentations, her written informed consent was not valid because Dr. Veca did not completely answer all of her questions about the biopsy procedure, and moreover, because the consent was obtained before she had an opportunity to ask any questions.
We do not believe these allegations should be considered or evidence admitted to prove them. The Uniform Consent Law provides that, except for proof of inducement by misrepresentation, no evidence shall be admissible to modify or limit the authorization set forth in a written consent. La.R.S. 40:1299.40(B). The statute defines consent in writing as that which (a) sets forth the nature and purpose of the procedure together with certain risks, (b) acknowledges that the information has been disclosed and that all questions asked have been answered satisfactorily, and (c) is signed by the patient. La.R.S. 40:1299.40(A). The consent form executed by Mrs. Leonhard satisfies this definition; hence, evidence is not admissible to modify or limit it. By her second argument Mrs. Leonhard attempts to do precisely what Subsection B prohibits, that is, to modify the authorization contained in her written consent. The consent form that Mrs. Leonhard signed, but admittedly did not read, specifically states, as required by the statute, that "all questions about the procedure or procedures have been answered in a satisfactory manner ..." and further lists as a possible complication, loss of function of a leg. Mrs. Leonhard testified that if she had been aware of the risk of the complications printed on the form, she would not have consented to the biopsy. We cannot accept such an explanation as setting aside written consent. The statute quite reasonably prohibits a patient from contradicting the express terms of a consent he has signed, because, were such contradiction allowed, the written consent would become meaningless. Hence, we reject Mrs. Leonhard's second assignment of error.
Having found that the written consent validly informed Mrs. Leonhard of the risk, we do not believe it necessary to consider her third assignment of error in which her counsel vigorously argues in opposition to the Trial Judge's findingthat lack of informed consent did not cause Mrs. Leonhard's damages, because a reasonable patient informed of the risks would have consented to the biopsy.
The reasonable patient standard of causation, which has been mandated by our Supreme Court, is to be used only in cases where the consent obtained does not measure up to the standards of La.R.S. 40:1299.40. LaCaze v. Collier, 434 S.2d 1039, 1048 (La.1983); F. Rozovsky, Consent to Treatment, Sec. 1.13.4 (1984). We have found that Mrs. Leonhard's consent to the biopsy was valid under the statute and that application of the reasonable patient standard is therefore unnecessary. We believe, however, that even assuming no valid informed consent, Mrs. Leonhard did not prove her case because she failed to show that her damage was caused by Dr. Veca's alleged failure to inform her of the risk of complications. Although it was an unnecessary finding, we agree with the Trial Judge that a reasonable patient, even one who had a fear of nerve injury, suffering from intensifying back pain would have consented to a diagnostic needle biopsy of the L-5 region despite knowledge that serious, virtually irreparable neurological injury occurs in less than one-tenth of one percent of all cases.
For the foregoing reasons, we affirm the judgment of the Trial Court dismissing Mr. and Mrs. Leonhard's suit. All costs to be paid by Mr. and Mrs. Leonhard.
AFFIRMED.
NOTES
[1] La.R.S. 40:1299.40(A) provides:

Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
This provision has superseded the jurisprudential rules defining consent to medical treatment. LaCaze v. Collier, 434 So.2d 1039, 1046 (La.1983).
[2] In an article published in June of 1981, after Mrs. Leonhard's surgery, in The Journal of Radiology, "Percutaneous Skeletal Biopsy 1981: A Procedure for RadiologistsResults, Review, and Recommendations," by Drs. William A. Murphy, Judy M. Destouet and Louis A. Gilula, it was found that of an estimated 9,500 needle biopsies, the rate of all complications was 0.2% or 20 out of 9,500. Serious neurological injury occurred in 0.08% of the needle biopsies reported. Foot drop was reported in 0.03% of the cases studied.