506 So.2d 131 (1987)
Filemon LEIVA abd Susan Leiva
v.
Dr. Francis C. NANCE and Hotel Dieu Hospital.
No. CA-6457.
Court of Appeal of Louisiana, Fourth Circuit.
April 9, 1987.
Rehearing Denied May 20, 1987.
Darryl Tschirn, Metairie, John M. Robin, Covington, for appellees.
McKernon & Taylor, Julia E. Taylor, Baton Rouge, for appellants.
Before GULOTTA, BYRNES and LOBRANO, JJ.
GULOTTA, Judge.
In this medical malpractice case, defendant appeals from a $250,000.00 jury award. We reverse and set aside the award.
Filemon Leiva was referred to Dr. Francis C. Nance as a possible candidate for a gastric partition operation for "morbid obesity", a condition described as being 100 pounds over or twice an individual's ideal weight. The gastric partition is a surgical procedure whereby the stomach is partially closed. The purpose of this procedure is to reduce food intake resulting in weight loss.
In May, 1982, plaintiff underwent the operation at Hotel Dieu Hospital. Approximately two hours after surgery, Leiva experienced a decrease in blood pressure, indicating internal bleeding. In a second immediate surgical intervention, a bleeding *132 blood vessel was discovered in the area of the spleen. Despite a successful suture of the blood vessel, the spleen was lacerated, requiring removal.
A third operation was required to remove a small abscess found at the operative site.
Initially, plaintiff and his wife filed suit against Dr. Francis Nance and Hotel Dieu. However, Hotel Dieu was later dismissed on an exception of prematurity. No appeal has been taken from that judgment. Following trial, the jury, in written interrogatories, found Dr. Nance "guilty of negligence or malpractice in his treatment of Filemon Leiva" and "guilty of negligence in failing to disclose material facts, reasonably necessary to allow" plaintiff to make an intelligent consent regarding the gastric partition. Plaintiff was awarded $250,000.00.
Appealing, defendant contends that:
1) because plaintiff failed to support his malpractice claim with competent medical evidence, the trial judge erred in not granting defendant's motion for a directed verdict;
2) the trial judge erroneously allowed into evidence, over defendant's objection, inflammatory and highly prejudicial testimony;
3) because the plaintiff had signed a consent form which complied with the statutory requirements, the trial judge erred in allowing plaintiff to introduce evidence on informed consent;
4) the trial judge erred in excluding the testimony of a witness who had personal knowledge of discussions with plaintiff on informed consent;
5) because plaintiff's injury was not permanently disabling, the trial judge erred in not granting a remittitur on the $250,000.00 award.
Plaintiff, on the other hand, claims that during the first surgery, defendant, in manipulating his (plaintiff's) stomach, "tore the spleenic artery loose from inside the spleen" thereby causing the internal bleeding. Leiva further contends that Nance admitted to having violated proper medical procedures by not identifying all blood vessels when cutting them and not properly checking for bleeders, thus necessitating the second surgical intervention. It is plaintiff's argument that the evidence presented establishes that defendant's treatment fell below the required standard of care.
Plaintiff further claims that because the "misrepresentations" made by defendant to him and to his wife did not properly inform them of the risks involved with gastric partition surgery, the judge did not err in allowing evidence on informed consent. Additionally, plaintiff asserts that it was not error to allow cross examination of Nance on how he (defendant) learned about the gastric partition procedure because that testimony relates to defendant's skill and is relevant and probative in determining whether there was informed consent. Plaintiff also maintains that the trial judge was correct in not allowing the testimony of Dr. Steven Blau on informed consent since Blau, a witness who defendant had known about a month earlier, was not made known to plaintiff until the morning of trial and thus was a surprise witness.
Lastly, plaintiff maintains that because of his spleenectomy, he suffered an increased susceptibility to phlebitis and thrombophlebitis along with numerous other problems flowing therefrom, thus supporting the amount awarded.

INFORMED CONSENT
We consider the informed consent issue first.
When a patient gives written consent to medical treatment pursuant to Louisiana's Uniform Consent Law, no other evidence "shall be admissible to modify or limit" the consent except evidence proving that "the consent was induced by misrepresentation". LSA-R.S. 40:1299.40.
LSA-R.S. 40:1299.40 provides that written consent to a surgical procedure shall set forth in general terms the nature and purposes of the procedure together with the known risks, "... if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with *133 such procedure or procedures". The statute also provides that the form must indicate that a disclosure has been made of the aforesaid and that all questions regarding the procedure have been answered in a satisfactory manner. The statute further states that the consent form be signed by the patient, and that the written consent is presumed to be valid and effective in the absence of proof that execution of the consent was induced by misrepresentation. The statute additionally requires that in the absence of a written form, an explanation is required to be given to the patient by the physician regarding disclosures and risks as set forth and required in the written form.
At the outset, it is significant to recognize that a consent form which was in compliance with statutory requirements was signed by the plaintiff.[1] In such instance, the written consent is presumed to be valid in the absence of proof that execution of the consent was induced by misrepresentation. However, because of the claim of misrepresentation on the part of Dr. Nance, it is necessary that an examination be made of the evidence to ascertain whether or not misrepresentations were indeed made.
In this regard, Dr. Nance testified that at his first meeting with plaintiff, Leiva, in response to his (defendant's) question as to whether he had tried other methods of weight loss, stated that he had tried several and had failed. Nance further testified that he described to plaintiff the purpose of the gastric partition and discussed the risks and complications of the surgery including the possibilities of death, stroke, and post-operative bleeding. Defendant also stated that Leiva was told that the surgery could possibly aggravate his pre-existing condition of phlebitis. Furthermore, admitting that he did not review the consent form with Leiva, Nance did state that he had told Leiva that he would be required to sign the form. Additionally, Nance related that he did not tell plaintiff about post-operative bleeding regarding damage to the spleen, because this was included in the general category of bleeding.
Plaintiff testified that Nance had explained the procedure for a gastric partition to him and related that, like an appendectomy, it was a fairly simple operation. Leiva further stated that defendant did not tell him about any complications that might result from the surgery. Additionally, plaintiff testified that Nance never reviewed a consent form with him or told him that he would be required to sign one. According to Leiva, a nurse brought him the consent form prior to surgery and read to him only the written part which stated that defendant was going to perform a gastric partition. However, plaintiff admitted that he had signed the consent form without reading it, and that at the time of signing, he did not feel he was being pressured or that he was forced to sign.
Plaintiff's wife testified that Nance had mentioned no complications and had related that the operation, like an appendectomy, was a simple procedure.
The evidence considered, we cannot say that consent was induced by misrepresentation. Although both plaintiff and his wife testified that defendant related that the operation was a simple procedure similar to an appendectomy, we do not find this testimony to be of great significance. Furthermore, Leiva signed a consent form which listed the following as "known risks" sometimes associated with the operation: death, infection, hemorrhage, sterility, impotence, brain damage, disfiguring scars, paralysis, the loss of function of body organs, and the loss of function of any arm or leg. Under these circumstances, plaintiff was aware before surgery of the known risks which he did in fact suffer, namely hemorrhaging, i.e., the post-operative bleeding problem and the loss of the function of an organ, i.e., the spleen.
Having concluded that plaintiff's claims regarding lack of consent do not show consent induced by "misrepresentation", we hold that the written consent is valid.

*134 DENIAL OF MOTION OF DIRECTED VERDICT
We next turn to defendant's first assignment of error in which he contends the trial judge erred in denying his motion for a directed verdict. In support of this contention, Nance contends that plaintiff presented no expert witness testimony that he (defendant) had breached any standard of care or that any negligent acts had occurred. We note that although defendant presented this assignment of error in light of the trial judge's denial of his motion for a directed verdict, defendant's contention is that the evidence was not sufficient to support a jury verdict in favor of plaintiff.
In granting a motion for a directed verdict, the court considers all evidence presented in a light and with all reasonable inferences most favorable to the party opposed to the motion. If the court believes the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable men could not reach a contrary verdict, granting of the motion is proper. However, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men exercising impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. Matranga v. Sara Mayo Hospital, 463 So.2d 632 (La.App. 4th Cir.1984) writ denied 467 So.2d 540 (La.1985).
In a medical malpractice case, the burden is on plaintiff to establish that defendant's conduct was below the standard of care required of others practicing in his same specialty. LSA-R.S. 9:2794; Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978); Gurdin v. Dongieux, 468 So.2d 1241 (La.App. 4th Cir.1985) writ denied 474 So.2d 946 (La.1985); Wiley v. Karam, 421 So.2d 294 (La.App. 1st Cir.1982). In determining whether defendant possessed the requisite degree of knowledge or skill or whether he exercised reasonable care and diligence, the court is guided by expert witnesses who are members of defendant's profession and who are qualified to testify. Gurdin v. Dongieux, supra.
Plaintiff's case consisted of the testimony of Dr. Nance, under cross examination, and the testimony of Dr. Terence O'Donovan, Filemon Leiva and Susan Leiva.
Nance testified that in a gastric partition, after the "top" part of the stomach is immobilized, the gastric vessels between the stomach and the spleen are identified, divided and then closed by using surgical clips or by tying with either sutures or a string. According to Dr. Nance, the failure to tie or clip a vessel is a violation of the standard of care where there is an indication that bleeding is occurring.
After performing the gastric partition, Nance stated that he followed proper medical procedure by searching the surgical site for bleeding blood vessels. He then irrigated the surgical site and finding no "bleeders", closed the incision. Defendant further testified that because plaintiff's blood pressure later began dropping, he suspected that Leiva was experiencing internal bleeding thus requiring a second surgical intervention. During his search for the source of bleeding, Nance "mobilized" the spleen and found the bleeder, a gastric artery located in the hileum (hollow) of the spleen. In the course of repairing this artery by suturing, the spleen was lacerated requiring removal. Indicating that he did not know what caused the bleeder, the defendant stated that it could have resulted from a number of different causes including a tear, a clot loosening in a previously clotted vessel, or a clip or tie coming off. Furthermore, Nance stated that no physician can ever be sure that a clip will hold a vessel and that he had not mobilized the spleen during the first surgery because under the standard of practice in upper gastrointestinal surgery, the spleen is to be left alone unless there is a reason to remove it. Finally, defendant stated that a laceration of the spleen in a gastric partition is not a breach of medical procedure.
A plaintiff expert, Dr. Terence Gregg O'Donovan, a thoracic surgeon, but not an expert in gastrointestinal surgery, did not offer testimony that would support a conclusion that Dr. Nance was guilty of the *135 commission of a breach in the standard of care in his treatment of plaintiff. According to this witness, bleeding after surgery is a risk of surgical procedures which can start hours after a procedure has been concluded, and does not necessarily indicate surgical error. Dr. O'Donovan related that there are any number of things that can cause a vessel, which was not bleeding upon completion of the surgical process, to bleed post-operatively. The witness stated that abnormalities of the clotting mechanism, coughing, vomiting, clips and ties becoming loose or improperly attached are some of the things that can cause post-operative bleeding. The witness also indicated that in abdominal surgery it is difficult to avoid injuring the spleen and that "one of the not uncommon accompaniments of doing operations on the stomach is the fact that you have to concomitantly remove the spleen". He additionally stated that the possibility of such an injury has to be accepted and does not necessarily constitute an error on the part of the surgeon. Moreover, although O'Donovan stated that it is not proper procedure to cut an artery inside the spleen, he did state that all individuals "vary tremendously in their anatomy and the length of their vessels" and in a case of morbid obesity the ability to define these vessels is "considerably restricted" when "operating under those circumstances". Finally, the witness stated "that the necessity of having to remove the spleen following surgery of a gastric partitioning on somebody for morbid obesity" would not be a breach of the standard of care if it occurred during the surgical procedure.
Filemon Leiva indicated that on the day after surgery Nance told him that during the first surgery one of the instruments "must have slipped under your spleen and damaged it." Plaintiff further testified that defendant related that after repairing the damaged area, the spleen continued to bleed whenever touched and in order to keep from doing a third operation, he (defendant) removed the spleen.
Plaintiff's wife testified that after the second surgery, Nance told her that an artery had been left open from the first surgery and that he had sutured it. She further related that defendant had told her that they thought that this would stop the bleeding but whenever the spleen was touched it would ooze blood and as a result he removed the spleen to insure no more bleeding.
At the conclusion of plaintiff's case, after Dr. Nance had testified under cross examination and Dr. O'Donovan and Mr. and Mrs. Leiva had testified on direct and cross, the defendants moved for a directed verdict, which was denied. Although styled as a complaint that the trial judge erred when he denied the motion for a directed verdict, Nance argues that the evidence taken in its entirety does not support the jury verdict. We agree.
Dr. Ruary O'Connell, a general and gastrointestinal surgeon, testified that bleeding is a post-operative risk that is slightly increased in a morbidly obese patient. According to the witness, clips or ties attached to the end of arteries can come off, thus allowing bleeding in the post-operative period. In the witness's opinion, this can result from several possibilities including the clip not being put on adequately, a change in blood pressure, vomiting, or traction. O'Connell further stated that in the absence of any bleeding, the surgeon does not pull on the clip to see if it is well secured. Moreover, the witness related that upon completion of the surgical procedure, a surgeon searches for bleeding, and utilizes irrigation as a method of ascertaining if residual bleeding exits. The witness additionally stated that a tie or clip coming off during the post-operative period does not indicate a breach of the standard of care on the part of the surgeon.
O'Connell also testified that he had reviewed the medical records in the instant case and it was his opinion that defendant's treatment of plaintiff, including the removal of the spleen, was basically within the standard of care. Finally, the witness stated that a non-bleeding unclamped vessel will not be found at the time of surgery regardless of the type of search conducted.
*136 Dr. William A. Rock, Jr., a chemical and anatomical pathologist who studied the medical records in the instant case, testified that the bleeding started about four to five hours after surgery and probably resulted from a "loose" blood vessel.
When we consider the medical evidence in the instant case, we fail to find any support for a legal conclusion that Dr. Nance breached the standard of care required. Our conclusion is not based upon a factual credibility determination, but is based upon a legal conclusion of insufficiency of evidence.
We note that prior to undergoing surgical treatment for his morbid obesity, plaintiff suffered from no acute medical problems other than a pre-existing condition of phlebitis. Considering the numerous complications that he has endured since his surgical treatment, it is conceivable and perhaps understandable that the jury rendered a verdict in plaintiff's favor. Nonetheless, the burden that a plaintiff carries in these cases is clear, and in the instant case there is simply no medical evidence to support the jury's verdict.
Having so concluded, we reverse and set aside the judgment of the trial court. Judgment is now rendered dismissing plaintiff's suit at his prejudice and at his cost.
REVERSED, SET ASIDE, AND RENDERED.
APPENDIX A

*137 
NOTES
[1] See "Appendix A" attached.