530 So.2d 101 (1988)
Yvonne HUTTON
v.
Claude C. CRAIGHEAD, M.D., Hartford Insurance Company, et al.
No. CA-8834.
Court of Appeal of Louisiana, Fourth Circuit.
August 16, 1988.
Rehearing Denied September 14, 1988.
Writ Denied December 2, 1988.
*102 S. Alfred Adams, Carruth, Cooper and Adams, Baton Rouge, for defendants/intervenors/appellants.
Franklin D. Beahm, Thomas, Hayes and Beahm, New Orleans, for defendants/appellants.
Trevor G. Bryan, James A. Gray II, Jefferson, Bryan, Gray & Jupiter, New Orleans, for plaintiff/appellee.
Before BYRNES, CIACCIO and PLOTKIN, JJ.
PLOTKIN, Judge.
This malpractice case involves three issues: (1) Whether the plaintiff's malpractice claim was timely filed, (2) Whether the physician made material misrepresentations which vitiated the patient's informed consent and (3) Whether comparative negligence applies in informed consent malpractice cases.
Facts
Plaintiff, Yvonne Hutton, sued defendants, Dr. Claude Craighead and his insurer Hartford Insurance Co. The jury rendered a verdict for Ms. Hutton; however, the trial court granted a mistrial. This court reversed that decision and ordered the trial court to reinstate the jury verdict awarding $200,000 to the plaintiff. Hutton v. Craighead, No. C-7037 (La.App. 4th Cir.1987).
*103 The instant appeal arises from the jury verdict.
In June of 1980, the plaintiff, a 5'1", 280 pound, forty-one year old woman saw Dr. Harold G. Shelby, an internist/gastroenterologist, for complaints of high blood pressure, chest pains, depression and obesity. Dr. Shelby described Ms. Hutton as morbidly obese, which means one hundred pounds more than ideal weight. He stated that she suffered from other medical illnesses exacerbated by her obesity. He thought her depression was caused by her limited ability to ambulate and to function at her job as a licensed practical nurse. Dr. Shelby testified that because Ms. Hutton had been habitually unsuccessful at dieting, he recommended she see Dr. Craighead for a new surgical procedure which would result in weight reduction and longterm weight control. He called Dr. Craighead on September 25, 1980 to explain her medical conditions and problems.
On September 29, 1980, Ms. Hutton consulted with Dr. Craighead concerning gastro-gastrostomy surgery for weight loss. This procedure entails a partial stapling of the stomach so that it is divided into a very small pouch connected to a larger pouch by a small tube with an opening of 1.5 centimeters. The purpose of the procedure is to reduce food intake, which results in weight loss.
At the time of this conference with the defendant doctor, Ms. Hutton had been an active, knowledgeable, experienced, licensed practical nurse since 1972. She was well aware of her physical conditions and her medical needs. She knew that her current medical conditions were caused by or contributed to by her obesity. She admitted at trial that she was informed by her physician, Dr. Shelby, and that she knew that the purpose of gastro-gastrostomy was to assist morbidly obese persons to lose weight. Additionally, she possessed information about the procedure from television and knew the medical difference between a gastric bypass and a gastric stapling. The sole purpose of her consultation with the defendant was to consider whether she should undergo gastro-gastrostomy surgery in a effort to lose weight.
Plaintiff admits in brief and the evidence is undisputed that the following discussion occurred at the conference:
Dr. Craighead explained the gastric stapling procedure to her and drew a diagram showing that the stomach would be stapled across at the top leaving the upper portion as a small pouch and a small aperture between the upper and lower portion. By this device she would get a quick feeling of satiety when she ate and by this means she would consume less without having to undergo a diet.
The evidence also indicated that the defendant explained the standard informed consent form and the various risks of the procedure, and that he answered all the plaintiff's questions.
Despite the above admissions, plaintiff contends that she would not have consented to the gastro-gastrostomy procedure except for Dr. Craighead's alleged material misrepresentations, which will be discussed subsequently.
At the conclusion of the conference, the doctor advised the plaintiff to think about her decision. Nevertheless, without requesting any further conferences, the plaintiff called the defendant to advise him that she voluntarily elected to undergo the surgery. She then made arrangements to be admitted into Touro Infirmary.
Plaintiff was admitted to Touro on October 26, 1980. On October 28, Ms. Hutton signed the "Consent to Treatment Form" in the presence of Dr. Jerry Kaplan, Dr. Craighead's resident, who explained the risks of the procedure. The operation, which was successful, took place October 29. Ms. Hutton does not claim, nor does she present any evidence, that the surgical procedure itself was below the standard of care. During her confinement subsequent to the surgery, the plaintiff was visited by Dr. Craighead and by a dietitian, who informed her about proper eating habits following the surgery. She was advised to eat small amounts of food and to stop eating when the sensation of fullness or nausea occurred.
*104 When Ms. Hutton was released from the hospital on November 10, her incision had not healed. It continued to drain until May of 1981 when Dr. Craighead admitted her to Mercy Hospital, opened up the site of the incision and left the wound open to heal. Dr. Craighead continued to see Ms. Hutton until July 6, 1981.
In August of 1981, Ms. Hutton saw Dr. Carter Nance. She complained that the wound was still draining and that she had not lost much weight since the surgery. At that time, she weighed 252 pounds. On examining Mrs. Hutton, Dr. Nance found that the staples were intact, but the opening between the pouches had stretched from 1.5 to 1.7 centimeters. Dr. Nance suggested tightening the opening to 1.3 centimeters, but Ms. Hutton declined further surgery.
In August of 1982, Ms. Hutton was admitted to Tulane Medical Center by Dr. Stella Jones, who ordered an x-ray of her stomach. The x-ray revealed that the small upper stomach pouch had stretched until it was equal in size to the lower pouch. At that time, the plaintiff weighed 287 pounds.
Prescription
Ms. Hutton's surgery took place October 29, 1980 and her claim was filed August 1, 1983. LSA-R.S. 9:5628, which governs the prescriptive time period, provides as follows:
Actions for medical malpractice
A. No action for damages for injury or death against any physician ... duly licensed under the laws of this state, whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
Appellants argue that when Ms. Hutton saw Dr. Nance in September of 1981 and was told that the operation ought to be done again, she became aware of a possible claim. Therefore, they maintain, her suit should have been filed at the latest in September of 1982. However, Dr. Nance testified that when he saw Ms. Hutton he informed her that the gastric partition was intact and that there was no indication that Dr. Craighead's surgery had been done inappropriately. However, appellees argue that Ms. Hutton did not become aware of the defendant's alleged misrepresentation of the nature and benefits of the surgery until August 4, 1982, when the radiologist's films revealed that she had two full-sized stomachs.
Since Ms. Hutton could not reasonably have known of the outcome of the surgery until August 4, 1982, her suit was timely filed on August 1, 1983. The mere apprehension that "something was wrong" is not enough to start prescription unless plaintiff knew or should have known by reasonable diligence that her problem might have been caused by malpractice. Cordova v. Hartford Accident & Indemnity Company, 387 So.2d 574 (La.1980). Ms. Hutton's claim was timely filed within one year of the date of discovery and within three years of the October 29, 1980 operation. Shortess v. Touro Infirmary, et. al, 520 So.2d 389, (La.1988).
Informed Consent
Ms. Hutton consented to the gastro-gastrostomy operation by reading and signing a consent form, which was unquestionably in compliance with the requirements of LSA-R.S. 40:1299.40. (See Appendix.) In LaCaze v. Collier, 434 So.2d 1039 (La. 1983), the Louisiana Supreme Court concluded that the statutory language has superseded the jurisprudential rules defining consent to medical treatment. Therefore, under the statute, when a patient consents in writing to medical treatment pursuant to Louisianas's Uniform Consent Law, no other evidence "shall be admissible to modify or limit" the consent except evidence proving "the consent was induced by misrepresentation" *105 Leiva v. Nance, 506 So.2d 131, 132 (La. App. 4th Cir.1987).
The statute further provides that the nature and purposes of the surgical procedure to be undergone by the patient must be set out in general terms in a valid consent form. If any of the following enumerated risksdeath, brain damage, quadriplegia, paraplegia, the loss or loss of functin of any organ or limb, of disfiguring scarsare associated with the procedure, it must also be stated in the consent form.
When, as in the instant case, a consent form which complies with the statutory requirements was signed by the plaintiff, the written consent is presumed to be valid in the absence of proof that the execution of the form was induced by misrepresentation. Id. at 133. A five-judge panel of this court has recently held that the use of the statutory language in the written form, "coupled with the patient's right to ask questions concerning his treatment and to have them answered to his satisfaction before signing a consent form, is sufficient to indicate informed consent to medical treatment." Hondroulis v. Schuhmacher, 521 So.2d 534 (La.App. 4th Cir.1988).
Ms. Hutton claims, however, that Dr. Craighead induced her to consent to the surgery by a misrepresentation of material facts as to the nature and purpose of the procedure. Specifically, Ms. Hutton alleges that Dr. Craighead misrepresented the following three facts: (1) That the surgery would obviate the need for her to exercise will power in controlling her eating habits, (2) That she would lose about 80 pounds and (3) That the doctor had had personal success with this procedure in weight reduction.
Because of the presumption that a written consent is valid in the absence of proof that the consent was induced by misrepresentation, we have examined the record and determined no misrepresentations of material fact which would vitiate consent were made. The record reveals the following testimony from Ms. Hutton on direct examination:
Q. All right, what did Dr. Craighead tell you about the surgery?
A. That the surgery was a gastric partitioning. I would not be able tomy stomach would not get full by the upper portion, my stomach being partitioned off from the bile and I would eat and be full, I could eat what I wanted and that I wouldn't need to diet.
Q. And what would happen?
A. I would lose weight.
Q. Did he say or do anything to give you any indication of how much weight you could expect to lose?
A. He showed me a chart that they have, according to your height and size and my ideal weight on that chart.
Q. Based on your conversation with Dr. Craighead did you get an impression about your weight what you could expect your weight to be after surgery?
A. I believe, yes, I did, I believe I would get down to around my ideal weight.
Under cross-examination, Ms. Hutton testified again as to her expectations based on information from Dr. Craighead:
Q. When you went to Dr. Craighead's office for the first time, you and Dr. Craighead sat down and discussed the gastric partitioning surgery, did you not?
A. Yes.
Q. And were all your questions answered appropriately?
A. Yes.
Q. Did Dr. Craighead tell you it was a new procedure?
A. Yes.
Q. Did Dr. Craighead tell you, I believe you testified to this, that there would be a stapling across the stomach with the hose between the top pouch and lower pouch and the connection of the hose, so that food could pass from the top pouch to the lower pouch?
A. Yes.
*106 Q. Did Dr. Craighead also tell you that as a result of the gastric stapling that when you eat food you would have a sensation or feeling of fullness?
A. Yes.
Q. Meaning that you felt like you had a full meal?
A. I would be full.
Q. And the idea of the pouch would be explained to you by Dr. Craighead that it doesn't take that much food to fill up the pouch for you to get the full feeling and you would stop eating, correct?
A. That's right.
Q. Did he explain that to you?
A. Correct.
Q. Now you didn't give your consent to the surgery in September of 1980, did you, when you met with Dr. Craighead the first time.
A. No.
Q. You were supposed to call him back, correct?
A. Yes.
Q. Was that at Dr. Craighead's suggestion that you retreat and think about the surgery before you agree to have it?
A. It was my idea.
Q. Okay, why did you have that idea?
A. I wanted to talk things over with my family.
Q. So, you wanted time to reflect?
A. Yes.
Q. And then indeed you did reflect upon it and decided to have the surgery?
A. Yes.
On appeal, Ms. Hutton argues that she was misled concerning the benefits of the surgery because she understood that she would not have to exercise any willpower to lose the weight she wanted to lose. The above testimony reveals that Ms. Hutton was not misled; she clearly understood the mechanics of the weight loss with the procedureshe would not have to exercise as much willpower as with a regular diet because there would be a physical barrier to prevent her from ingesting more than a small amount of food at each meal. Ms. Hutton is a licensed practical nurse; we can assume that she is more aware than the average person of bodily processes. We can also presume that she recognizes the inexorable calories in/calories out equation that results in weight gain or weight loss. That she was able to defeat the system by continuing to eat until the small pouch was stretched out to the size of a normal stomach cannot be attributed to misrepresentation by the surgeon.
Ms. Hutton argues in her second point that she was led to believe she would lose 80 pounds. This argument should not be considered because the consent form Ms. Hutton signed specifically states "there can be no guarantee expressed or implied either as to the result of treatment or as to cure." Hence, evidence is not admissible as to expressed or guaranteed results of treatment. Leonhard v. New Orleans East Orthopedic Clinic, 485 So.2d 1008 (La.App. 4th Cir.1986), Writ denied, 489 So.2d 919 (La.1986).
We also find no merit in Ms Hutton's third argument that she would not have undergone the surgery had she not believed Dr. Craighead had personally had success with the gastro-gastrostomy procedure. The record reveals that Ms. Hutton was aware that the surgery she elected was a new procedure. Therefore, even if she knew of Dr. Craighead's reputation as an accomplished surgeon, she could not have thought he was experienced at this particular procedure. Furthermore, the surgery was performed correctly.
Considering the evidence in the case at bar, we find no support for the plaintiff's claim that consent was induced by material misrepresentation. We realize that Ms. Hutton did not achieve the results she sought when she agreed to the surgery and that she suffered for more than a year with a wound infection. It is understandable that a jury would sympathize with her. Yet, the burden of proof borne by the plaintiff is clear, and there is no evidence of misrepresentation to support the jury *107 verdict. Therefore, we find that the evidence before the trier of fact in this case does not furnish a reasonable basis for the decision in this case. Canter v. Koehring Co., 283 So. 2d 716, 724 (La.1973). Since we find that the jury verdict is manifestly erroneous, we reverse. Id.
Because we find no fault on Dr. Craighead's part, we will not address the issues of comparative negligence and quantum.
Accordingly, the judgment of the trial court is reversed and plaintiff's suit is dismissed. Each party is to bear its own costs.
REVERSED AND RENDERED.

APPENDIX

CONSENT TO TREATMENT

(Informed Consent is required by Louisiana law.)
1. I hereby authorize and direct Doctor Craighead with associate and assistants to perform upon: myself the following medical diagnistic and/or therapeutic procedure or surgical operation: gastro-gastrostomy.
2. The above is understood to include any necessary or advisable anesthesia, xray studies and blood transfusions except as follows: none.
3. In general terms the nature and purpose of this operation or procedure is as follows and this has been satisfactorily explained to me: procedure to make stomach smaller.
4. The advantages and disadvantages of the proposed operation or procedure have been explained to me. I am advised that complications may occur, the nature of which cannot be accurately anticipated. Therefore there can be no guarantee expressed or implied either as to the result of treatment or as to cure. I hereby give my consent for the disposal of any tissues or parts which may be removed, unless otherwise noted.___________
5. I further authorize the doctors to perform at the time of the above-described operation or procedures, any additional operations or procedures beyond those now contemplated which in their judgment are advisable for my well being.
6. I understand and acknowledge that the following known risks, among others, are sometimes associated with this procedure and/or anesthesia: death; brain damage; disfiguring scars; paralysis, including quadriplegia and paraplegia; the loss of or loss of function of body organs; and the loss of or loss of function of any arm or leg.
7. I hereby certify and acknowledge that I understand this consent, that full disclosure has been made to me, that all questions about the procedure or procedsures have been answered in a satisfactory manner, and that all blanks were filled in prior to my signature.
Date 10/28/80 Time 3:30 p.m. Signature of Patient Ms. Yvonne M. Hutton Signature of Relative_____________ (where required)
Witness: Bletitier RN
I certify that all blanks in this form were filled in prior to signature and that I explained all of the foregoing to the patient or his representative before requesting the patient or his representative to sign it.
Jerry Kaplan M.D.
TOURO INFIRMARY