546 So.2d 466 (1989)
Viola K. HONDROULIS
v.
John SCHUMACHER, M.D. and Hartford Fire Insurance Company.
No. 88-C-0600.
Supreme Court of Louisiana.
June 19, 1989.
Rehearing Denied September 11, 1989.
*468 Trevor G. Bryan, Jefferson, Bryan, Gray & Jupiter, New Orleans, for applicant.
Edward Rice, Jr., Lisa D. Newman, Adams & Reese, New Orleans, for respondent.

ON REHEARING
DENNIS, Justice.
Plaintiff, Viola Hondroulis, filed suit against John Schumacher, M.D., alleging the following facts: Mrs. Hondroulis consulted Dr. Schumacher in May, 1981, when she began to experience the spontaneous onset of pain in the lower back radiating down into her right hip and right leg. Dr. Schumacher treated her conservatively until June 24, 1981 when he performed a myelogram and lumbar laminectomy upon her. Subsequent to the surgery, plaintiff continued to experience pain in the lower back radiating down into the right hip and right leg and began to experience incontinency, constipation and numbness in her entire left leg. Before surgery, the plaintiff signed a consent form but was not properly informed by the doctor of the risk of losing the function of her organs, nerves or muscles, particularly with respect to those that control the use of her bladder. This risk was material and the doctor should have advised her of it. The plaintiff, as a reasonable person, would have refused the surgery had she been advised of the risk. The doctor failed to advise the plaintiff of alternative methods of treatment presenting smaller risks. The plaintiff did not know that a material risk of the operation was the loss of sphincter and bladder control and numbness in the left leg.
Defendant, Dr. Schumacher, filed a motion for summary judgment on the informed consent claim solely on the ground that the plaintiff signed a written consent to surgery stating that she understood all of the risks of the surgery and conforming with the statutory requirements of La.R.S. 40:1299.40. In the written consent form plaintiff Hondroulis consented to a lumbar laminectomy to remove a ruptured disc and acknowledged that "the following known risks are associated with this procedure including anesthesia: death; brain damage; disfiguring scars; paralysis; the loss of or loss of function of body organs; and the loss or loss of function of any arm or leg" and "further acknowledge[d] that all questions I have asked about the procedure have been answered in a satisfactory manner."
In opposition to the motion the plaintiff filed her deposition and her affidavit. In her affidavit she stated that Dr. Schumacher did not inform her prior to the operation of the risk of urinary incontinence or loss of use of her good left leg or give her an opportunity to ask questions about the surgical procedure or the alternative methods of treatment. In her deposition she testified that she had been admitted to the hospital for testing and that a myelogram had been performed. Without informing her of the results of the myelogram Dr. Schumacher came in to her room and said surgery would be necessary and that he would schedule her for the following day. *469 He did not give her an opportunity to ask any questions. The nurse came in later and presented a form for Mrs. Hondroulis to sign telling her that it was the routine and to just sign it. She did not have an opportunity to ask questions at this time.
After a hearing, the trial court rendered summary judgment in favor of the doctor and against the plaintiff patient reasoning that a doctor does not have to inform a patient of all conceivable risks, that the consent form complied with R.S. 40:1299.40 and that plaintiff did not allege that the execution of the form was induced by misrepresentation of material facts.
Plaintiff appealed, and the court of appeal affirmed. 521 So.2d 534 (4th Cir. 1988). The opinion of the court signed by two judges held that the doctor's disclosure of the risk of "loss or loss of function of any organ or limb" fulfilled the requirement of informed consent under La.R.S. 40:1299.40(A) because this statutory language, coupled with the patient's right to ask questions, is sufficient to indicate informed consent, citing that court's decisions in Madere v. Ochsner Foundation Hospital, 505 So.2d 146 (La.App.4th Cir. 1987) and Leiva v. Nance, 506 So.2d 131 (La.App.4th Cir.1987). Three judges of the court of appeal "reluctantly concur[red]", because the court of appeal, en banc, by a 6 to 6 deadlock, had refused to overturn the decisions relied upon by the two-judge lead opinion. In the absence of the precedent affirmed by deadlock, they would have held that the consent form's "loss of function of body organs" warning did not adequately disclose the material risk of "incontinence", and that to hold otherwise "leads to the absurd result that a physician [can] merely copy the language of the statute for every surgical procedure." 521 So.2d at 538.
This court granted a writ to consider whether the trial and appellate courts correctly interpreted La.R.S. 40:1299.40 and its impact upon the informed consent doctrine as expressly and impliedly adopted by the courts of this state. 522 So.2d 571 (La.1988). The legislative enactment must, of course, be considered within the context of the jurisprudential development upon which its effect was intended to apply.

I. Informed Consent Doctrine

Patient's RightDoctor's Duty
The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body. LaCaze v. Collier, 434 So.2d 1039 (La.1983); Canterbury v. Spence, 464 F.2d 772 (D.C.Cir.1972); Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92 (1914). Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment. Id.; Prosser & Keeton on Torts § 32 p. 190 (5th ed. 1984) (citing authorities at n. 61); Halligan, The Standard of Disclosure by Physicians to Patients: Competing Models of Informed Consent, 41 La.L.Rev. 9 (1980). Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment. LaCaze v. Collier, 434 So.2d at 1043, 1045; Canterbury v. Spence, supra, at 789; Louiselle & Williams, Medical Malpractice, 1981, § 22.01 at 594.44; Prosser & Keeton, supra, p. 190; see Sard v. Hardy, 281 Md. 432, 379 A.2d 1014 (1977); Crain v. Allison, 443 A.2d 558 (D.C.App.1982); Miller v. Van Newkirk, 628 P.2d 143 (Colo.App. 1981); Truman v. Thomas, 2TI Cal.3d 285, 165 Cal.Rptr. 308, 611 P.2d 902 (1980).

Scope of DisclosureMaterial Information
The doctor's duty is to disclose all risks which are "material". LaCaze v. Collier, 434 So.2d at 1045-46; Wheeldon v. Madison, 374 N.W.2d 367, 375 (S.D.1985) ("Materiality is the cornerstone upon which the physician's duty to disclose is based."); *470 Canterbury v. Spence, supra; Crain v. Allison, supra; Kinikin v. Heupel, 305 N.W.2d 589 (Minn.1981); See Barclay v. Campbell, 704 S.W.2d 8 (Tex.1986); Prosser & Keeton, supra, p. 191. In broad outline, a risk is material when a reasonable person in what the doctor knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy. Canterbury v. Spence, supra, at 787; LaCaze v. Collier, supra, at 1045-46; Harbeson v. Parke Davis, Inc., 746 F.2d 517 (9th Cir.1984); Prosser & Keeton, supra at p. 191.
The factors contributing significance to a medical risk are the incidence of injury and the degree of the harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small. But if the chance of harm is slight enough, and the potential benefits of the therapy or the detriments of the existing malady great enough, the risk involved may not be significant even though the harm threatened is very great. Canterbury v. Spence, supra, at 788 and authorities cited therein; see Halligan, supra at p. 28; see generally, Harper, James & Gray, § 16.9, p. 469 et seq.
The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony. Harbeson v. Parke Davis, Inc., supra; Canterbury, 464 F.2d at 786; Adams v. Richland Clinic, Inc., PS. 37 Wash.App. 650, 681 P.2d 1305 (1984); see Smith v. Shannon, 100 Wash.2d 26, 666 P.2d 351, 356 (1983); Sagala v. Tavares, 367 Pa.Super. 573, 533 A.2d 165 (1987).

CausationObjective Standard
There must be a causal relationship between the doctor's failure to disclose material information and material risk of damage to the patient. LaCaze v. Collier, supra, at 1048; Canterbury v. Spence, supra, at 790; see East v. United States, 629 F.Supp. 682 (E.D.Mo.1986); Sard v. Hardy, supra. Because of the likelihood of a patient's bias in testifying in hindsight on this hypothetical matter, this court and others have adopted an objective standard of causation: whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed. LaCaze v. Collier, supra, at 1048; Canterbury v. Spence, supra; Hook v. Rothstein, 281 S.C. 541, 316 S.E.2d 690 (1984); Adams v. El-Bash, 338 S.E.2d 381 (W.Va.1985); Reikes v. Martin, 471 So.2d 385 (Miss.1985); Wheeldon v. Madison, supra; Barclay v. Campbell, supra; Cobbs v. Grant, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972); Hartke v. McKelway, 707 F.2d 1544 (D.C.Cir.1983).

ExceptionsDoctor's Privilege Not to Disclose
The doctor is not required to disclose material risks or information when a genuine emergency arises because the patient is unconscious or otherwise incapable of consenting, and harm from a failure to treat is imminent and outweighs harm threatened by the proposed treatment. Canterbury v. Spence, supra, at 788; see Prosser & Keeton, supra, at p. 192, n. 77 ("Compare Keogan v. Holy Family Hospital, 1980, 95 Wash.2d 306, 622 P.2d 1246 (true emergency), with Dewes v. Indian Health Service, D.S.D. 1980, 504 F.Supp. 203 (inadequate emergency)."). In situations of that kind the physician should, however, attempt to secure a relative's consent if possible. But if time is too short to *471 accommodate discussion, the doctor should proceed with treatment. Canterbury v. Spence, supra, at 789 and authorities cited therein. See Allen v. Roark, 625 S.W.2d 411 (Tex.App.1981), modified, 633 S.W.2d 804; see generally Boland, The Doctrines of Lack of Consent and Lack of Informed Consent in Medical Procedures in Louisiana, 45 La.L.Rev. 1, 17 (1984); Meisel, The "Exceptions" to the Informed Consent Doctrine: Striking a Balance Between Competing Values in Medical Decision Making, 1979 Wis.L.Rev. 413 (1979).
A doctor has a "therapeutic privilege" to withhold disclosure of a material risk when the physician reasonably foresees that disclosure will cause the patient to become ill or emotionally distraught so as to foreclose a rational decision, complicate or hinder treatment, or pose psychological damage to the patient. Canterbury v. Spence, supra, at 789; see Meisel, supra. This privilege must be carefully circumscribed, however, for otherwise it might devour the disclosure rule itself. Even in this kind of situation, the doctor should attempt to make disclosure to a close relative and obtain his consent. Canterbury v. Spence, supra, at 789 and authorities cited therein.
The physician is not required to disclose risks that are not reasonably foreseeable, Hanks v. Drs. Ranson, Swan, and Burch, Ltd., 359 So.2d 1089 (La.App.1978); Reiser v. Lohner, 641 P.2d 93 (Utah 1982); Kranda v. Houser-Norborg Medical Corp, 419 N.E.2d 1024 (Ind.App. 1981), or not material, Precourt v. Frederick, 395 Mass. 689, 481 N.E.2d 1144 (1985); Masquat v. Maguire, 638 P.2d 1105 (Okl.1981); McKinney v. Nash, 120 Cal.App.3d 428, 174 Cal. Rptr. 642 (1981); Henderson v. Milobsky, 595 F.2d 654 (D.C.Cir.1978). Risks that are commonly understood, obvious, or already known to the patient need not be disclosed by the doctor. See Prosser & Keeton, supra, at 192 and authorities cited therein.

Burden of Proof
In a trial on the merits of a suit claiming inadequate disclosure of risk information by a physician, the patient has the burden of going forward with evidence tending to establish prima facie the essential elements of the cause of action, and ultimately the burden of persuasion on those elements. Canterbury v. Spence, supra, at 791. See also McCormick on Evidence (3rd ed. 1984) sections 336-338. The burden of going forward with evidence pertaining to a privilege not to disclose, however, rests properly with the physician. This is not only because the patient has made out a prima facie case before an issue on privilege is reached, but also because any evidence bearing on the privilege is usually in the hands of the physician alone. Id. See 9 J. Wigmore, Evidence §§ 2486, 2488, 2489 (Chadbourn rev.1981).

II. The Statute
The statute whose construction is involved in this case is La.R.S. 40:1299.40. It provides in pertinent part:
§ 1299.40. Consent to medical treat ment; exception
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
*472 B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.

III. Considerations Preliminary to the Interpretation of the Statute

A. The Patient's Fundamental Right to decide whether to obtain or refuse medical treatment
The United States Supreme Court's holdings regarding the right to privacy were succinctly set forth in Carey v. Population Services International, 431 U.S. 678, 684-685, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977). Although "[t]he Constitution does not explicitly mention any right of privacy," the Court has recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). This right of personal privacy includes "the interest in independence in making certain kinds of important decisions." Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). While the outer limits of this aspect of privacy have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions "relating to marriage, Loving v. Virginia, 388 U.S. 1, 12, [87] S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); procreation, Skinner v. Oklahoma ex rel Williamson, 316 U.S. 535, 541-42, 62 S.Ct. 1110, 1113-1114, 86 L.Ed. 1655 (1942); contraception, Eisenstadt v. Baird, 405 U.S. [438] at 453-454, 92 S.Ct. [1029] at 1042, 1043-1044 [31 L.Ed.2d 349 (1972)] (White, J, concurring in result); family relationships, Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); and child rearing and education, Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); Meyer v. Nebraska [262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)]." Roe v. Wade, supra, 410 U.S. at 152-153, 93 S.Ct. at 726. See also Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-640, 94 S.Ct. 791, 796-797, 39 L.Ed.2d 52 (1974).
The decision to obtain or reject medical treatment clearly should be recognized as falling within this cluster of constitutionally protected choices. Although the highest court has yet to so hold, one lower federal court and numerous state courts have reasoned from Supreme Court decisions that the right to privacy is broad enough to grant an individual the right to chart his or her own medical treatment plan. See, e.g. Rasmussen by Mitchell v. Fleming, 154 Ariz. 207, 741 P.2d 674 (1987); Bouvia v. Superior Court, 179 Cal.App.3d 1127, 225 CaLRptr. 297 (1986); Brophy v. New England Sinai Hospital, Inc., 398 Mass. 417, 497 N.E.2d 626 (1986); In matter of Farrell, 212 NJ.Super. 294, 514 A.2d 1342 (1986); Foody v. Manchester Memorial Hospital, 40 Conn.Supp. 127, 482 A.2d 713 (1984); Matter of Welfare of Colyer, 99 Wash.2d 114, 660 P.2d 738 (1983); Severns v. Wilmington Medical Center, Inc., 421 A.2d 1334 (Del.1980); Matter of Spring, 380 Mass. 629, 405 N.E.2d 115 (1980); Leach v. Akron General Medical Center, 68 Ohio Misc. 1, 426 N.E.2d 809 (1980); Satz v. Perlmutter, 362 So.2d 160 (Fla. 1978); Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977); Matter of Quinlan, 70 N.J. 10, 355 A.2d 647, cert. denied sub nom., Garger v. New Jersey, 429 U.S. 922, *473 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); Andrews v. Ballard, 498 F.Supp. 1038 (S.D. Tex.1980); cf. In Re P.V.W., 424 So.2d 1015 (La.1982).
The choice of whether to undergo surgery or other medical treatment, no less than the decision to continue or terminate pregnancy, is, to an extraordinary degree, an intrinsically personal decision. The patient alone must live with his disorder, encounter the risks of therapy or reap the consequences of treatment. By the same token, the choice will profoundly affect his or her development or life. It may mean the difference between life and death, pain and pleasure, proverty and economic stability. See Rasmussen by Mitchell v. Fleming, supra; Andrews v. Ballard, supra.
Art. I, Section 5 of the 1974 Louisiana Constitution expressly guarantees that every person shall be secure in his person against unreasonable "invasions of privacy." This safeguard was intended to establish an affirmative right to privacy impacting non-criminal areas of law and establishing the principles of the Supreme Court decisions in explicit statement instead of depending on analogical development. See Hargrave, Declaration of Rights, 35 La.L.Rev. 1, 21 (1974); see e.g. Roshto v. Hebert, 439 So.2d 428 (La.1983); Jaubert v. Crowley Post-Signal, Inc., 375 So.2d 1386, 1387-88 fn. 2 (La.1979); Easter Seal Society v. Playboy Enterprises, 530 So.2d 643, 646-647 (La.App.4th Cir.1988). Accordingly, we conclude that the Louisiana Constitution's right to privacy also provides for a right to decide whether to obtain or reject medical treatment.
Several other states have held that the right to choose or reject medical treatment is both a federal and state constitutionally protected right. Rasmussen by Mitchell v. Fleming, supra (Arizona); Bouvia v. Superior Court, supra (California); In re Guardianship of Barry, 445 So.2d 365 (Fla.D.C.App.1984); Matter of Quinlan, supra (New Jersey); Matter of Coyler, supra (Washington).
That the constitutionally protected right to privacy extends to an individual's liberty to make medical treatment choices does not, however, automatically invalidate every state legislative regulation in this area. The practice of advising patients and obtaining their consent to treatment may be regulated in ways that do not infringe on protected individual choices. See Carey v. Population Services Intern., supra. And even a burdensome regulation may be validated by a sufficiently compelling state interest. In Roe v. Wade, for example, the Supreme Court cautioned that a woman's right to terminate her pregnancy is not absolute and that certain state interests may at some point "become sufficiently compelling to sustain regulation of the factors that govern the abortion decision." 410 U.S. at 154, 93 S.Ct. at 727. Thus, where a decision as fundamental as those included within the right of personal privacy is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests, Carey v. Population Services Intern., 431 U.S. at 685, 97 S.Ct. at 2016; Roe v. Wade supra; cf. U.S. v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).
With these principles in mind we turn to the question whether the court of appeal was correct in its interpretation of La.R.S. 40:1299.40, the statute at issue in this case.

B. Constitutional Pitfalls of the Court of Appeal's Interpretation
The court of appeal interpreted the statute as a rule of law decreeing that when a patient signs a written form which tracks the statute's language describing broad categories of damages that may result from medical treatment generally, i.e., "death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, or disfiguring scars", she thereby gives "informed consent" to encounter every particular material risk involved in the surgery or treatment proposed by her physician that could result in the generally described kinds of damages. Although the court of appeal did not say that the statute establishes a conclusive or irrebuttable presumption of informed consent flowing from a patient's signature *474 upon such a form, the substance and impact of its interpretation is to this effect. See Comment, The Irrebutable Presumption Doctrine In The Supreme Court, 87 Harv.kRev. 1534, 1545 (1974).
If the Court of Appeal's statutory construction is correct, there can be little doubt that the statute is unconstitutional.
Under the Court of Appeal's view, the statute would impose a burden on or significantly interfere with the rights of patients to decide to obtain or reject medical treatment. Physicians would be encouraged by the law merely to present patients with a form copying the phraseology of the stat ute, rather than to fully inform each patient in layman's terms of the nature and severity of the particular material risks to be encountered in her case and the likelihood of their occurrence. Without pertinent case-specific information patients would lack the capacity to reason and make judgments on their own. They would therefore be deprived of the freedom to personally decide intelligently, voluntarily and without coercion whether to undergo the recommended treatment. The practical effect of the statute would be to deprive or burden an individual's right to decide to accept or forego medical treatment by substantially limiting access to information essential to a meaningful decision regarding the therapy proposed by the physician.
There remains the inquiry whether the provision, as interpreted by the court of appeal, serves a compelling state interest and is narrowly drawn to express only the legitimate interests at stake. Clearly the state's interests in maintaining medical standards and in protecting health cannot be invoked to justify such a statute. Instead of furthering these legitimate purposes, the statute as construed by the lower courts would provide a disincentive for physicians to meet their own professional standards. A physician's standards require him to inform the patient of "everything pertinent both to his condition and to the probable course of his treatment which he is capable of understanding intellectually and able to accept emotionally," Laufman, Surgical Judgment, in Christopher's Textbook of Surgery 1459, 1461 (9th ed. L. Davis 1968), so as to afford the patient "a clear understanding of the risks and benefits of the proposed treatment alternatives or non-treatment, along with a full understanding of the nature of the disease and the prognosis." Wanzer et al, The Physician's Responsibility Toward Hopelessly 111 Patients, 310 New EngJ.Med. 955, 957 (1984). Evidently, very few, if any, medical practitioners believe that good medical care and health will be promoted by eliminating the physician's duty to inform his patient of highly significant information regarding treatment risks.
Although the text and environment of La.R.S. 40:1299.40 suggest that it furthers other state interests, none of these is comparable to those heretofore recognized as compelling. The state certainly has an interest in (1) decreasing the number of fraudulent medical claims by regulating the proof of informed consent, for the purpose of (2) reducing the cost of medical malpractice insurance and thereby (3) attracting and retaining medical talent and the delivery of adequate medical services within the state. Even if these purposes were deemed to be compelling, however, they would not justify the severe burden upon and interferences with patients' access to information necessary to the exercise of their rights to make informed choices with respect to medical treatment that would be imposed by the court of appeal's interpretation of La.R.S. 40:1299.-40. The statute may be drawn or interpreted more narrowly to further the purposes of regulating proof of informed consent without causing physicians to withhold from patients all information except the phraseology of the statute.
Because the court of appeal's interpretation of the statute would raise serious questions as to its constitutionality, we are called upon to determine whether there is another, equally reasonable and perhaps more appropriate, construction of the statute under which its validity may be clearly sustained. It is a basic rule of statutory interpretation that, if a statute is susceptible of two constructions, one of which will render it constitutional and the other of *475 which will render it unconstitutional, or raise grave and doubtful constitutional questions, the court will adopt the interpretation of the statute which, without doing violence to its language, will maintain its constitutionality. State v. Manuel, 426 So.2d 140 (La.1983); Pearce ex rel. Structural Pest Control Com. v. Sharbino, 254 La. 143, 223 So.2d 126 (1969); Trahan v. Baudoin, 252 So.2d 740 (La.App. 1st Cir. 1971); Bums v. Board of Trustees 367 So.2d 849 (La.1979); State v. Newton, 328 So.2d 110 (La.1976); Branton v. Parker, 233 So.2d 278 (La.App. 1st Cir.1970); see also Dir. of La. Recovery Dist. v. Taxpayers, 529 So.2d 384 (La.1988); New Orleans Firefighters Association, et al. v. Civil Service Commission of the City of New Orleans, 422 So.2d 402 (La.1982).

IV. Interpretation of the Statute
Although the interpretation of La. R.S. 40:1299.40 is problematic because of the statute's lack of clarity and precision, we conclude that the legislative aim was to establish a rebuttable, rather than a conclusive, presumption of consent to encounter risks adequately described in the consent form, subject to the patient's right to overcome the presumption by showing that consent was induced by misrepresentation. In our opinion, under the statute, (1) if it is proved that the patient signed a document purporting to warn him of a risk involved in the proposed surgery or treatment, (2) it is presumed that the patient understood and consented to encounter whatever risk a reasonable person, in what the doctor knew or should have known to be the patient's position, would have apprehended from the written consent form, and (3) the patient cannot disprove the presumed fact except by showing that his consent was induced by misrepresentation.
The court of appeal's view that the statute, in effect, provides for a conclusive or irrebuttable presumption of informed consent is erroneous for several reasons. First, the court of appeal's interpretation would render the statute unconstitutional or raise grave doubts as to its validity, for the reasons previously expressed. Second, the statute does not provide that the presumption shall be "conclusive" or "irrebuttable" but specifically states that the presumption may not stand in the presence of proof of misrepresentation. Since a conclusive presumption is not a presumption in the true sense of the term but in reality is a rule of law, the simple term "presumption" should be interpreted to convey its generally prevailing meaning in the absence of clear contrary indication in the statute. In other contexts, the legislature has expressly designated presumptions as "conclusive" when it intended to establish a rule of this type. E.g., La.R.S. 40:1299.131. Third, the statute provides merely that a presumption of "consent", rather than of "informed consent", shall arise upon execution of the consent form. This is another indication that the legislative intent was not to impose the legal consequences of "informed consent" by rule of law upon every patient who signs a consent form but that the aim was to provide that the presumed fact (consent to encounter the risks adequately described in the consent form in layman's terms) arises from proof of the basic fact (execution of a consent form containing such adequate risk information).
By the same token, we are also prompted to reevaluate portions of our own interpretation of the statute in LaCaze v. Collier, 434 So.2d 1039 (La.1983). In retrospect, our statements in LaCaze that "R.S. 40:1299.40 has ...superseded ...the jurisprudential rules defining consent to medical treatment" and that "the physician [no longer is] required to discuss with the patient alternatives to the proposed treatment" are overly broad in view of the constitutional dimension of some aspects of the informed consent doctrine. Since a patient's right to choose her own medical treatment plan necessarily implies that she has a right to make considered and careful selections among the alternative medical options available in her case, a law which unjustifiably deprives or burdens this right by causing physicians to suppress or limit access to information essential to the patient's informed decision could hardly pass constitutional muster. Because the LaCaze interpretation of the statute in these respects cannot be justified by a compelling *476 state interest and is not narrowly drawn to express only such an interest, we will adopt a more restricted yet equally reasonable interpretation of the statute that will render it constitutional without doing violence to its language. Our institutional reluctance to modify a previous opinion is eased in this case by the fact that the statements could have been deleted from the LaCaze opinion without seriously impairing the analytical foundations of its holding.
The statute may be interpreted reasonably as a modest amendment to the informed consent doctrine, rather than as a cryptic restatement of the whole body of law severely burdening or interfering with the rights of patients to make intelligent medical choices. Prior to this enactment our courts attached no particular legal significance to a medical consent merely because it happened to be in writing. (Apparently, only two American jurisdictions accorded any presumption of validity to a written consent by case law. See Zaretsky v. Jacobson 126 So.2d 757 (Fla.App.1961); Luna v. Nering, 426 F.2d 95 (5th Cir.1970) (Texas); See Meisel and Kabnick, Informed Consent To Medical Treatment: An Analysis of Recent Legislation, 41 U.Pitt.L.Rev. 407, 468 (1980) and authorities cited therein.) Consequently, a patient could introduce virtually any kind of relevant evidence to prove lack of consent or to rebut the doctor's evidence that the patient had consented to the therapy. Therefore, the statute may be viewed reasonably as having as its principal object a change in the law providing that, notwithstanding any other law to the contrary, a written consent to encounter the risks disclosed therein may not be rebutted except by a showing that consent was induced by misrepresentation.
Since the statute does not expressly define or redefine the cause of action for failure to obtain informed consent, such an intention should not be read into its provisions. Its aim is simply to affect the burden borne by the plaintiff who would controvert the disclosure or consent set forth in the consent form. The statute is similar to provisions in ten other states dealing with either "consent forms," the need for a writing in obtaining informed consent, or the evidentiary value of a writing. See Meisel and Kabnick, supra at p. 467. These laws have not been construed to work any drastic changes in the informed consent right of action. See Pauscher v. Iowa Methodist Medical Center, 408 N.W.2d 355 (Iowa 1987); Petty v. United States, 740 F.2d 1428 (8 Cir.1984); Meisel & Kabnick supra at 469. Instead, the significant aspect of the statutes that has been noted is that they all contain provisions clothing the writing with a presumption of validity. Even when viewed as presumption rules these provisions are ambiguous at best, leaving a great deal of uncertainty as to what practical significance they have and how, if at all, they change the common law of informed consent. See Meisel and Kabnick, supra at 469, 562-564.
For these reasons, we conclude that, notwithstanding prior judicial expressions, the legislature by enacting La.R.S. 40:1299.40, did not intend to make substantive alterations in the informed consent doctrine. More particularly, the legislature did not intend to change the law with respect to major elements of the cause of action such as the doctor's duty to disclose material information (including reasonable alternative therapy) or the patient's burden to prove the materiality of any risk not disclosed. That the statute does not contain an express restatement of these principles is due simply to their being integral parts of the jurisprudential doctrine that the legislature tacitly accepted in accomplishing its limited purpose of regulating proof of lack of informed consent. Accordingly, we do not think the statute's reference to "known risks" indicates an intention to require physicians to inform patients of all known risks however slight or immaterial. It is more likely that the reference is to the general rule that the physician cannot be responsible for warning his patient of a hazard unless he either knew or, because of the state of knowledge in the medical profession, should have known of the particular risk. See Sard v. Hardy, 281 Md. 432, 379 A.2d 1014 (1977); Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676 (1972); Revord v. Russell, 401 N.E.2d 763 (Ind. *477 App.1980); 2 Louisell and Williams, Medical Malpractice § 22.16 (1988); Waltz and Scheuneman, supra at 630-635. The "known risk" qualification is actually a limitation upon the kind of material risk that the doctor must disclose; it does not expand his duty to require him to warn of nonmaterial risks. In a statute obviously designed to afford physicians some protection against frivolous claims and the susceptibility of claimants' testimony to modification based on hindsight it is highly unlikely that the legislature intended to enlarge doctors' potential liability so as to encompass responsibility for failure to warn of any known risk.
Similarly, it is a reasonable and constitutional interpretation of the statute that a physician must disclose all known material risks to his patient, but only if the risk foreseeably may result in "death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, [or] disfiguring scars", in order to qualify the written consent for the presumption of validity. See Hondroulis v. Schumacher, 521 So.2d 534, 535-536 (4th Cir.1988) (Lobrano, J., concurring). These undoubtedly are the most serious types of damage which may result from medical treatment or surgery. If the risk is one that cannot foreseeably result in damage of this type it does not fall within the ambit of the statute. Accordingly, these damage categories serve to mark the limits of the legislated law and were not intended to deprive patients of the concrete case-specific material information that is essential to an informed and intelligent decision as to proposed treatment.

V. Application Of Legal Precepts To This Case
In moving for summary judgment the defendant physician did not controvert the plaintiff's allegations that there was a risk of incontinence and loss of permanent bladder control associated with the surgery, that the risk was material, or that the risk materialized in her damage. The doctor moved exclusively on the ground that Mrs. Hondroulis was conclusively or irrebuttably presumed (or deemed by law) to have given informed consent to encounter every material risk associated with the surgery because she signed the consent form tracking the statutory language. We have concluded that the presumption created by the statute is not so broad, however, and that the patient is only presumed to consent to encounter whatever risks a reasonable person, in what the doctor knew or should have known to be the patient's position, would have apprehended from the written consent form. Consequently, the only issue presented by this case is whether the doctor carried his burden of showing there is no genuine issue that Mrs. Hondroulis, or a reasonable person in what the doctor should have known to be the plaintiffs position, was aware of the material risk of incontinence and loss of bladder control from the facts disclosed in the consent form so that her signature on the form was tantamount to informed consent.
Mrs. Hondroulis signed a written form in which she consented to the proposed surgery and acknowledged that she was aware that a risk of "loss of function of body organs" was associated with the procedure. Accordingly, it is presumed that she understood and consented to encounter whatever risk a reasonable lay person, in what the doctor knew or should have known to be her position, would have apprehended from this language. Mrs. Hondroulis does not contend that she can disprove the presumed fact by showing that her consent was induced by misrepresentation. (Ambiguous statements, which are reasonably capable of both a true and false meaning, however, will amount to misrepresentation if the false meaning is accepted, and is intended or known to be accepted. Prosser & Keeton on Torts §106 (5th ed. 1984); Harper, James & Gray § 7.14 (1986); and authorities cited therein. So will nondisclosure where the parties stand in some confidential or fiduciary relation to one another. Id.)
On the other hand, in her papers opposing the motion for summary judgment, Mrs. Hondroulis averred and implied that the doctor knew that the surgery involved a risk that she would permanently lose control of her bladder and become incontnent, *478 that this was a material risk because a reasonable person would have attached significance to it in deciding whether to undergo the surgery, that the doctor did not inform her of this risk, that the risk materialized in her injury and disability, and that the doctor's failure to adequately disclose the risk caused her damage because a reasonable person properly informed would have decided against the surgery.
A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La.C.C.P. art. 966. Because the mover has the burden of establishing no material factual issue exists, inferences to be drawn from the underlying facts contained in the materials before the court must be viewed in the light most favorable to the party opposing the motion. Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Vermillion Corp. v. Vaughn, 397 So.2d 490 (La.1981); Mashburn v. Collin, 355 So.2d 879 (La.1977). To satisfy his burden the mover must meet a strict standard by a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. Adickes v. S.H. Kress & Co., supra; Sartor v. Arkansas Nat. Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944). The papers supporting mover's position are closely scrutinized, while the opposing papers are indulgently treated, in determining whether the mover has satisfied his burden. Adickes v. S.H. Kress & Co., 6 Moore's Federal Practice, sect. 56.15[3].
In order to apply these summary judgment precepts in an informed consent case it is essential to have a clear understanding of the two elements of the informed consent concept: information and consent.
With respect to the information element the general rule is that the physician is obliged to disclose all material risks of the therapy to the patient. The cases addressing this issue are legion, if not always uniform, see Waltz and Scheuneman, supra at 635, and we have discussed the question in some detail earlier in this opinion.
The cases have paid less attention to the consent element, Id. at 643, but it is this component of the informed consent concept that is crucial to a correct resolution of the present case. Consent connotes the dual elements of awareness and assent. Restatement of Torts 2d § 892 (1979). To establish consent to a risk, it must be shown both that the patient was aware of the risk and that he assented to encounter it. Restatement of Torts 2d § 892A (1979). Therefore, it is obvious that a risk must have been understandably communicated before the element of awareness can be established. Waltz and Schueneman, supra at 643. It is for this reason that statements in standardized consent forms that the patient has been informed of "all" risks are unavailing; awareness requires that specific risks have been communicated in fact. See, e.g., Rogers v. Lumbermens Mut. Cos. Co., 119 So.2d 649 (La.App.1960); Bowers v. Talmage, 159 So.2d 888 (Fla. App.1963); Corn v. French, 71 Nev. 280, 289 P.2d 173 (1955); Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (1966).
Communication involves the manner in which the physician must disclose risksthe vocabulary he must adopt and the degree of elaboration in which he must engage. Some courts have taken the approach that only the subjective state of mind of the patient should be considered in establishing the elements of awareness and consent. See DiFillippo v. Preston, 53 Del. 539, 173 A.2d 333 (1961); Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093 (1961); Bang v. Chas. T. Miller Hosp., 251 Minn. 427, 88 N.W.2d 186 (1958); Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (1966). This view has been criticized, because to require the physician, absolutely, to use language which his patient will in fact understand calls for clairvoyance. Waltz and Schueneman, supra at 644. Further, the subjective standard subjects the physician *479 to unfair risks of liability due to a claimant's testimony being modified by hindsight or to the physician's reasonably mistaken belief that his patient understood and assented. Id. at 645.
We believe that La.R.S. 40:1299.40 was adopted in response to problems of this kind and that an objective test of awareness is therefore more appropriate in interpreting and applying the statute. Accordingly, the physician is required to disclose material risks in such terms as a reasonable doctor would believe a reasonable patient in the plaintiff's position would understand. Technical language will not ordinarily suffice to disclose a risk to an untutored layperson; See, e.g., Corn v. French, supra; and abstract or blanket terms may not be adequate to communicate specific dangers. See, e.g., Petty v. United States, 740 F.2d 1428 (8 Cir.1984); Rogers v. Lumbermens Mut. Cos. Co., supra. In order for a reasonable patient to have awareness of a risk, she should be told in lay language the nature and severity of the risk and the likelihood of its occurrence. See Laufman, Surgical Judgment, in Christopher's Text Book of Surgery 1459, 1461 (9th ed. L. Davis 1968); Waltz and Schueneman, supra at 644.
Under the statute interpreted as adopting the objective test of consent, the patient is presumed to have been made aware of what a reasonable person should have apprehended from the doctor's disclosure, unless the physician should have known that something peculiar to the patient or her circumstances prevented her from having such an awareness. Professor Waltz and Mr. Scheuneman, supra at 645, succinctly explained the objective test as follows:
The basic issue in establishing consent is whether the physician was reasonable in proceeding after a risk was disclosed to the patient in a generally understandable manner. An objective test is therefore appropriate. The proper question is whether a reasonable man would conclude from the patient's behavior that he was aware of the risk and that he manifested a willingness to encounter it.
Drawing inferences from the facts contained in the summary judgment materials in the light most favorable to Mrs. Hondroulis, we conclude that there are genuine issues as to material fact and that the mover physician is not entitled to judgment as a matter of law. Assuming, as we must for purposes of the motion, that the doctor failed to inform Mrs. Hondroulis of the material risk of her loss of bladder control and incontinence that was associated with the surgery, that Mrs. Hondroulis was not aware of this particular hazard, that the materialization of the risk caused her loss of bladder control and incontinence, and that a reasonable patient in the plaintiff's position would have withheld consent to the surgery had the material risk been disclosed, the doctor would not be entitled to judgment because Mrs. Hondoulis should be allowed to recover as a matter of law.
An ordinary lay person would not gather from a warning that surgery involves a risk of "loss of function of body organs" that he or she is asked to assent to encounter the specific, material risk of being rendered permanently incontinent through loss of bladder control. The summary judgment materials do not show that Mrs. Hondroulis had any independent knowledge of this specific risk that was superior to that of an ordinary lay person. A bland statement as to a risk of "loss of function of body organs", particularly when not accompanied by any estimate of its frequency, does not amount to an understandable communication of any specific real risk. The average lay person is vaguely aware that any surgical operation involving anesthesia involves a slight chance of death and perhaps loss of body organ function that is no greater than the risk he or she assumes daily in driving an automobile, crossing a busy street or other activities causing nonmaterial risks. Consequently, a notice of risk of "loss of function of body organs", without any description of the frequency of occurrence, the specific organ threatened or the cause of the damage involved, tends to deemphasize the severity and frequency of the hazard. See Petty v. United States, *480 supra. By requiring the doctor to set forth the material risks "in general terms" the statute demands that he describe the main elements of each risk rather than limited details, but it does not permit him to "generalize" in the sense of making vague or indefinite statements that do not understably communicate the specific material risks to the patient. Any other interpretation of the statute would frustrate rather than promote intelligent self determination by patients and thereby undermine the informed consent doctrine and the patient's right to privacy.
Accordingly, the judgments below granting and affirming the summary judgment are reversed and the case is remanded to the trial court for further proceedings.
REVERSED AND REMANDED TO TRIAL COURT.
MARCUS, J., concurs and assigns reasons.
WATSON, J., dissents and assigns reasons.
COLE, J., concurs in the result. Summary judgment is not appropriate on the facts.
MARCUS, Justice (concurring).
While not agreeing with the majority's interpretation of the presumption of informed consent created by the statute, I concur in the result.
WATSON, Justice, dissenting:
There is no evidence that plaintiff's incontinence and numbness were reasonably foreseeable material risks of her lumbar laminectomy. The majority erroneously assumes, without evidence, expert or otherwise, that the result of plaintiffs surgery was a material risk of which she should have been informed. There is also no evidence that a reasonable patient in plaintiffs position, that of a nurse with a prior laminectomy, would have refused to undergo the surgery if advised of the possible adverse consequences.
The majority says that a reasonable person "... would have refused the surgery had she been advised of the risk." Why are there any laminectomies? Absent evidence that her present condition was a material risk of the surgery which would have persuaded a reasonable person to forego that surgery, plaintiff has failed to rebut the presumption of informed consent created by the statute.
I respectfully dissent, adhering to the original opinion.[1]
NOTES
[1] 531 So.2d 450 (La. 1988).