555 So.2d 600 (1989)
Jeannette Yvette LeBLANC
v.
Dr. Robert H. KRUPKIN and St. Paul Insurance Company.
Billy Joseph LeBLANC
v.
Dr. Robert H. KRUPKIN and his Owners, Landlord and Tenants Insurance Company.
Nos. CA 88 1650, CA 88 1651.
Court of Appeal of Louisiana, First Circuit.
December 19, 1989.
Writ Denied March 30, 1990.
*601 Arthur Cobb, Baton Rouge, for plaintiffs-appellants Billy Joseph LeBlanc, Jeannette Yvette LeBlanc.
Donald S. Zuber, Baton Rouge, for defendant-appellee Dr. Robert H. Krupkin.
Before CARTER, SAVOIE and ALFORD, JJ.
ALFORD, Judge.
These consolidated suits for damages were brought by appellants, Jeannette Yvette LeBlanc and Billy Joseph LeBlanc, for the alleged malpractice of the defendant/appellee, Dr. Robert H. Krupkin, relating to procedures performed on Mrs. LeBlanc consisting of a bilateral subcutaneous mastectomy and subsequent reconstruction. Trial by jury resulted in a judgment in favor of defendants and dismissal of the cases. Mr. and Mrs. LeBlanc bring the present appeal assigning as error the trial court finding of informed consent to the procedures. Appellants also assign as error the jury instruction that plaintiffs had to prove standard of care, rather than, instructing on the application of res ipsa loquitur; alternatively, appellants assert that the jury erred in not finding that Dr. Krupkin deviated below the standard of care proven.

FACTS
Mrs. LeBlanc was first examined by Dr. Krupkin on September 20, 1983. At the time, Dr. Krupkin was employed by Dr. Robert L. Elliot, Jr. at the Breast Clinic.[1] Both doctors are general surgeons who concentrate their practices in the area of disease and surgery of the breast. Mrs. LeBlanc complained to Dr. Krupkin of a lump in her breast and of having a discharge from her breasts. Dr. Krupkin testified that a sonogram revealed a diffuse area of thickening in Mrs. LeBlanc's breast, which he termed a fibrocystic change. Dr. Krupkin prescribed: abstinence from caffeine, salt, and tobacco;[2] dosages of vitamin E; and, a wireless support bra. Mrs. LeBlanc was next examined by Dr. Elliot on January 26, 1984. Dr. Elliot found a lack of understanding of her physical problem and a lack of strict adherence to the previously prescribed diet, for which further instruction was given. Dr. Elliot did not find any real clinical problem on examination.
On September 6, 1984, Mrs. LeBlanc was again examined by Dr. Krupkin; he found minimal fibronodularity and persistence of discharge. During this visit, Mrs. LeBlanc indicated that she desired to have the lump removed and also was interested in breast augmentation. Dr. Krupkin offered her four treatment options: 1) a biopsy of the *602 lump; 2) augmentation surgery, which he noted was not covered by insurance; 3) a biopsy combined with augmentation surgery, noting that insurance would probably not cover the augmentation; and, 4) bilateral subcutaneous mastectomy and reconstruction surgery, which he noted would reduce her cancer risk. On September 26, 1984, Mrs. LeBlanc scheduled surgery to have a bilateral subcutaneous mastectomy; it was performed by Dr. Krupkin on October 9, 1984. On January 24, 1985, the reconstructive surgery, which consisted of the implantation of breast prostheses, was performed.
Mrs. LeBlanc was displeased with the results of her surgeries. She testified at trial that she has disfiguring scars and considers herself to be deformed-looking; that certain movements cause one of the implants to slide underneath one of her arms or to flatten; and that she has problems with numbness. Additionally, Mrs. LeBlanc is unsatisfied because the size of the implants were not as large as she had wanted. Both Mr. and Mrs. LeBlanc testified that her difficulties resulting from the surgeries have greatly affected family relationships.

RES IPSA LOQUITUR
Appellants argue that Dr. Krupkin "amputated both of her [Mrs. LeBlanc's] breasts as a `prophylactic measure' "[3] when she did not need the surgery, and that, this constituted a situation to which the doctrine of res ipsa loquitur could be applied. Res ipsa loquitur is a rule of circumstantial evidence which applies when the facts shown suggest the negligence of the defendant as the most plausible explanation of the injury. McCann v. Baton Rouge Gen. Hosp., 276 So.2d 259 (La.1973). The doctrine of res ipsa loquitur applies when: (1) the accident would not normally occur in the absence of negligence; (2) there exists an absence of direct evidence to explain the activities leading to the injury; and (3) the accident or injury was caused by an agency or instrumentality within the actual or constructive control of the defendant. Galloway v. Ioppolo, 464 So.2d 386 (La.App. 1st Cir. 1985).
Res ipsa loquitur is irrelevant when a body of direct evidence is available explaining the activity leading to injury. Cangelosi v. Our Lady of the Lake Regional Medical Center, 551 So.2d 1296 (La. 1989); Montgomery v. Opelousas Gen. Hosp., 540 So.2d 312 (La.1989); McCann, 276 So.2d at 261. In the case sub judice, there is no dispute that the present condition of Mrs. LeBlanc's breasts results from the subcutaneous mastectomy and reconstructive procedures performed by Dr. Krupkin. Likewise, it is not asserted that negligence occurred during the operation, but rather, appellants contend that Dr. Krupkin was negligent in deciding to perform this drastic of a procedure considering Mrs. LeBlanc's physical complaints. Since there is ample direct evidence explaining the activities leading up to the surgeries complained of, res ipsa loquitur is not applicable.

STANDARD OF CARE
Appellants argue that Dr. Krupkin deviated below the standard of care imposed on his profession when he performed the bilateral subcutaneous mastectomy on Mrs. LeBlanc. The burden of proof imposed on a plaintiff in a malpractice action is governed by La.R.S. 9:2794(A):
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:

*603 (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
The opinions of expert witnesses who are members of the medical profession and who are qualified to testify on the subject are necessary to determine whether or not physicians possess the requisite degree of knowledge or skill, or failed to exercise reasonable care and diligence. Steinbach v. Barfield, 428 So.2d 915 (La. App. 1st Cir.), writ denied, 435 So.2d 431 (La. 1983). Expert testimony to establish a standard of care is unnecessary when a physician does an obviously negligent act from which lay persons can infer negligence, such as: "fracturing a leg during an examination; amputating the wrong arm; carelessly dropping a knife, scalpel, or acid on a patient; or leaving a sponge in a patient's body." Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986) (footnotes omitted). In the instant case, it is not possible for a lay person to infer negligence in the performance of a bilateral subcutaneous mastectomy with reconstruction where the patient, Mrs. LeBlanc, suffered from fibrocystic disease; expert testimony is necessary.
Dr. Krupkin testified that when he examined Mrs. LeBlanc on her first visit to the clinic, he found that she had mild fibrocystic disease which he described as "lumpy breasts." Dr. Krupkin further testified that the disease progressed to being severe, at the time the decision was made to perform surgery; he stated that this condition was not a malignancy. Dr. Krupkin testified that the post-surgery pathology report confirmed the diagnosis of benign fibrocystic disease.
Dr. Krupkin stated that at the time surgery was discussed, he presented Mrs. LeBlanc with four treatment options (as previously enumerated) available to treat appellant's condition, taking into account her request for breast augmentation. Although Dr. Krupkin stated that he did not recommend subcutaneous mastectomy as a necessary method of treatment, he believed it was indicated in Mrs. LeBlanc's situation. Dr. Krupkin testified that indicators for subcutaneous mastectomy included: a high cancer risk, fibrocystic disease and cancerphobia. While Dr. Krupkin did not find Mrs. LeBlanc to be at high risk for cancer, he found the presence of the other factors weighed in favor of performing the procedure. Dr. Krupkin testified that he related in his report prepared for Mrs. LeBlanc's records at Baton Rouge General Hospital, the reasons for undertaking the surgery were: inability to control the benign fibrocystic change, breast tenderness and pain, and the patient's marked concern for breast cancer. Dr. Krupkin testified at trial that another major consideration for the surgery was the patient's concern for the clinical appearance of her breasts.
Dr. Elliot testified that the standard of care in the specialty of breast surgery, is that surgery should not be done unless necessary; and, relative to a subcutaneous mastectomy, it should not be performed unless significant breast pathology is present. At the time of Dr. Elliot's examination in January of 1984, he did not think Mrs. LeBlanc's condition warranted a subcutaneous mastectomy; however, he could not say whether or not her condition had changed by September, when the decision *604 to operate was made. Dr. Elliot acknowledged that cancerphobia is a recognized indicator for the procedure. Dr. Michael Teague was called to testify as an expert in general and plastic surgery. Dr. Teague also agreed that a cystic-type disease and fear of cancer in a patient are indicators for the performance of a subcutaneous mastectomy.
The jury found that the conduct of Dr. Krupkin in this matter did not fall below the standard of care applicable to his activities. Based on the testimony presented, we are unable to hold that this finding is manifestly erroneous.

INFORMED CONSENT
The Uniform Consent Law as set forth in La.R.S. 40:1299.40 provides as follows:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient, or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
....
In order to recover damages for lack of informed consent, a plaintiff must prove: 1) non-disclosure, 2) of a known material risk, and 3) a causal relationship between the doctor's non-disclosure and the risk of damage to the plaintiff. See Hondroulis v. Schumacher, 546 So.2d 466 (La.1989). Where a written consent form is executed, the patient is presumed to understand and consent to encounter whatever risk a reasonable person, in what the doctor knew or should have known to be the patient's position, would have apprehended from the written consent form; and the patient cannot disprove the fact except by showing that his consent was induced by mispresentation. Id.
Mrs. LeBlanc executed a written consent form prior to each of her two surgical procedures; a copy of each form is appended hereto in Appendix A and B, respectively. Since these forms do not set forth the nature, purpose or known risks of the procedures for which they were executed, they do not constitute written consent in accordance with La.R.S. 40:1299.40A. Consequently, we must consider whether consent has otherwise been given in accordance with La.R.S. 40:1299.40C.
Dr. Krupkin testified that he verbally informed Mrs. LeBlanc as to the possible results and risks involved in the surgeries, during his consultations with Mrs. LeBlanc *605 on September 6, 1984, with both Mr. and Mrs. LeBlanc in September of 1984, and with the couple on the night before the first surgery. He stated that he informed the patient of the three major risks involved in any surgery, namely, excessive bleeding, possibility of infection and the possibility of death. Dr. Krupkin also stated that he advised the patient of the five major risks associated with the subcutaneous mastectomy and reconstructive surgery: loss of erectility of the nipple, loss of sensitivity to the nipple areolar complex and to the skin, infection, scarring, and that the contour of the breast will not be as perfect as it was prior to surgery. Additionally, Dr. Krupkin testified that he had shown the patient textbook photographs depicting the results of the surgeries.
Mrs. LeBlanc admitted that Dr. Krupkin described the surgeries to her, and related the process at trial as follows: "he said you leave the outer skin, the nipple and all this stuff intact, and he said he would take something like an ice cream scoop and scoop out the breast tissue, that I would have no breast for three months and at the end of three months he would go back in and do the reconstruction." She also admitted that Dr. Krupkin had explained some risks of the surgery to her in his office but denied any such discussion in the hospital. Mrs. LeBlanc testified that Dr. Krupkin told her of the loss of nipple erection, and of a partial loss of feeling in the area, maintaining that she was told the feeling would return. She also stated that she was told there would be scarring; however, she denies being told of the possibility of disfiguring scars. She also admits being told that the results would not be perfect; however, she stated that, "I don't think he ever told me the seriousness of the surgery." Mrs. LeBlanc denied being told of the possibility of death or brain damage, and, she testified that she did not remember being told of the possibility of infection. Although Mrs. LeBlanc admitted to being shown some photographs of scars resulting from breast surgery, she denied being shown photographs specifically relating to the subcutaneous mastectomy. Mrs. LeBlanc's testimony was supported by that of her husband.
Mrs. LeBlanc testified that her major concerns in having the surgeries were: removal of the lump in her breast and enlargement of the breasts. She stated that she wanted the augmentation surgery to result in a "C-cup" size; and, indicated to Dr. Krupkin that she wanted to look like her sister, who she described as a "perfect" C-cup. However, Mrs. LeBlanc admitted that she was not promised a C-cup, and that, Dr. Krupkin had instructed her to bring her sister by prior to surgery so he could see her, which she failed to do.
There exists obvious contradictions in the testimony as to exactly how many of the risks involved in Mrs. LeBlanc's surgery were disclosed. A reviewing court should not disturb reasonable evaluations of credibility even though other evaluations and inferences are as reasonable, since the trier of fact, in actually hearing and observing the witnesses, is in a better position to evaluate credibility. Aleman v. Lionel F. Favret Co., 349 So.2d 262 (La. 1977); Burbank v. LeBeouf, 471 So.2d 980 (La.App. 1st Cir.1985). The jury, in dismissing appellants' claims, could have found that all risks were adequately disclosed to the patient and that informed consent was given; such a finding would not have been manifestly erroneous.
For the reasons assigned herein, the judgment of the trial court is affirmed. All costs of this appeal are to be borne by appellants herein.
AFFIRMED.

*606 APPENDIX A

*607 APPENDIX B

NOTES
[1] Between the time of Mrs. LeBlanc's first surgery, October 9, 1984, and her second surgery, January 24, 1985, Dr. Krupkin ceased working at the Breast Clinic and opened his own office.
[2] Mrs. LeBlanc testified that she was not instructed to give up smoking.
[3] We note that the characterization, by counsel for appellants, of the procedure undergone by Mrs. LeBlanc as an amputation to be inaccurate and unsupported by the evidence. "Amputation" is defined as "the removal of a limb or other appendage or outgrowth of the body...." Dorland's Illustrated Medical Dictionary (25th ed. 1974). The medical testimony established that a subcutaneous mastectomy requires the surgical removal of underlying breast tissue, but leaving the outer skin surface intact. None of the physicians called, testified that Mrs. LeBlanc's breasts were amputated.